IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,            ✗
                                     ✗
        Plaintiff,                   ✗
                                     ✗
vs.                                  ✗      Cv. No. 03-2814-D/P
                                     ✗      Cr. No. 99-20228-D
RICHARD L. QUACKENBUSH,              ✗
                                     ✗
        Defendant.                   ✗
                                     ✗
                                     ✗

---

ORDER DENYING DEFENDANT'S MOTIONS TO AMEND
ORDER DENYING MOTIONS FOR A FAVORABLE RULING OR,
IN THE ALTERNATIVE, AN EVIDENTIARY HEARING
AND
ORDER DIRECTING THE PARTIES TO FILE SUPPLEMENT BRIEFS

---

On October 31, 2003, defendant Richard L. Quackenbush, Bureau of Prisons inmate registration number 17037-076, an inmate at the Federal Correctional Institution Williamsburg in Salter, South Carolina, through counsel, filed a motion pursuant to 28 U.S.C. § 2255 on October 31, 2003. The Court issued an order on May 28, 2004 directing the Government to respond to the motion. The Government filed its response on July 7, 2004. On July 27, 2004, Quackenbush filed what he characterized as a supplement to his § 2255 motion in which he sought to amend his motion to assert a claim pursuant to Blakely v. Washington, 124 S. Ct. 2531 (2004), and to reply to the Government's response. On August 13, 2004, Quackenbush submitted an exhibit to his July 27, 2004 supplement, consisting of his factual affidavit asserting an additional claim.

On September 10, 2004, Quackenbush filed a document entitled "Motion for Favorable Ruling or, Alternatively, an Evidentiary Hearing on Defendant's Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody." On October 19, 2004, Quackenbush filed a document, entitled "Supplement to Motion for Favorable Ruling or, Alternatively, an Evidentiary Hearing on Defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," in which he complained about the hardships imposed by his incarceration in light of Hurricane Ivan. On December 10, 2004, Quackenbush filed a second supplement to his motion for a favorable ruling or, in the alternative, an evidentiary hearing. On February 28, 2005, Quackenbush filed what he characterized as a third supplement to his motion but which is, in effect, an effort to amend his motion to assert a claim pursuant to United States v. Booker, 125 S. Ct. 738 (2005). The Government filed a response to defendant's third supplement on February 28, 2005.

From 1985 to 1995, Quackenbush was the Vice President for Underwriting for Universal Bonding Insurance Company ("Universal Bonding"), located in New Jersey.[1] Universal Bonding operated as the agent of Crum and Forster Insurance Company ("Crum & Forster") and its subsidiaries, Westchester Fire Insurance Company ("Westchester Fire") and/or United States Fire Insurance Company ("U.S. Fire"), through what is referred to in the insurance

---

[1]    The factual discussion in this order is largely taken from the presentence report.

2

industry as a reinsurance agreement. Crum & Forster, Westchester Fire, and U.S. Fire issued powers of attorney to Quackenbush making him an attorney-in-fact for the aforementioned companies and authorizing him to approve the issuance of performance bonds on their behalf.

In order to obtain a performance bond from the aforementioned insurance companies, the applicant ordinarily would have to submit detailed and truthful financial information to Universal Bonding or one of its brokers showing it had the financial resources and sufficient assets to reimburse the insurance companies in case a claim is made on the performance bond. If an applicant is approved for issuance of a performance bond, the applicant must sign a general indemnity agreement promising to indemnify the bonding company for any bond claims. In order to ensure that the applicant can indemnify the insurance companies against any claims under the performance bond, the applicant must also pledge liquid collateral in the form of cash, letters of credit, or government securities equal to the amount of the performance bond. Once all the information regarding the business venture, the applicant's financial condition, and collateral is presented to Universal Bonding, Quackenbush was responsible for reviewing the application to determine that the applicant met the insurance companies' requirements for issuance of performance bonds. It was the responsibility and duty of Quackenbush to ensure that performance bonds would not be issued

3

unless the aforementioned insurance companies were protected from financial loss.

David I. Namer d/b/a Network Mortgage Services and Offshore Insurance Services ("Namer") maintained an office in Memphis. Namer's primary business was the preparation, issuance, and sale of corporate notes to the investing public, allegedly for the purpose of raising operating capital for various business entities including, but not limited to, Transportation Leasing Corporation, Montalbano Builders, Hearthstone Accommodated Living Corporation, Lending and Investment Advisory, Inc., AVN Corporation, Tri Star Financial, and Voyager Lines. In order to sell these corporate notes through broker-dealers registered with the Securities and Exchange Commission and the National Association of Securities Dealers, Namer prepared offering statements known as Placement Memoranda. In the Placement Memoranda and in other representations, Namer represented to investors that all principal and interest owing to purchasers of the corporate bonds was insured by performance bonds issued by Universal Bonding, Crum & Forster, Westchester Fire, and/or U.S. Fire.

Beginning in or about February, 1994, and continuing up to and through October, 1996, Quackenbush entered into a conspiracy with Namer and others pursuant to which Quackenbush issued approximately $18.5 million in performance bonds insured by Universal Bonding, Crum & Forster, Westchester Fire, and/or U.S. Fire to companies and entitles controlled by Namer even though those companies did not meet the insurance companies' underwriting

4

requirements for issuance of performance bonds. In exchange, Namer secretly gave Quackenbush bribes amounting to approximately $120,000. In 1996 and 1997, most of the bonds issued by Namer went into default. Claims totaling more than $14 million were filed against Universal Bonding, Crum & Forster, Westchester Fire, and U.S. Fire.

Pursuant to a written plea agreement, Quackenbush appeared before District Judge Jon Phipps McCalla on September 23, 1999 to enter a guilty plea to a two-count information. The first count of the information charged Quackenbush with conspiracy to commit wire fraud, mail fraud, and laundering of monetary instruments, in violation of 18 U.S.C. § 371. The second count charged Quackenbush, aided and abetted by Namer and others, with a discrete act of money laundering, committed on or about October 3, 1994, in the amount of $7214.63, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Judge McCalla issued an order accepting the guilty plea on October 14, 1999. This judge conducted a sentencing hearing on November 1, 2002, at which time Quackenbush was sentenced to concurrent terms of forty-eight (48) months imprisonment on each count,[2] to be followed by a three-year period

---

[2] Although the motion filed by Quackenbush on October 31, 2003 asserted that the sentences on each count were consecutive, Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, filed Oct. 31, 2003 ("D. 10/31/03 Mot."), ¶ 4, that assertion is plainly inconsistent with the judgment in the criminal case.

The sentences were calculated as follows: Pursuant to § 3D1.2 of the United States Sentencing Guidelines ("U.S.S.G."), counts 1 and 2 were grouped together for sentencing purposes. The base offense level for money laundering is 20. U.S.S.G. § 2S1.1(a)(2). Nine points were added to the base offense level because the value of the funds exceeded $10,000,000 but was less than

(continued...)

of supervised release. Judgment was entered on November 6, 2002. Quackenbush did not take a direct appeal.

In his original § 2255 motion, which was filed on October 31, 2003, Quackenbush argued that he received ineffective assistance of counsel, in violation of the Sixth Amendment. In particular, Quackenbush alleged that his trial counsel (i) failed to object to the calculation of the amount of laundered funds contained in the presentence report; (ii) failed to argue that the dominant conduct at issue in the offenses to which Quackenbush entered guilty pleas was fraud; (iii) failed to challenge use of the money laundering guideline in the presentence report; (iv) failed to object to use of the 1998 edition of the Sentencing Guidelines Manual; (v) failed to challenge the amount of the loss attributable to Quackenbush; and (vi) labored under an apparent conflict of interest, due to the fact that counsel may have represented, or collaborated with, Universal Bonding in unrelated civil matters.[3]

---

[2]     (...continued)
$20,000,000. Id., § 2S1.1(b)(2)(J). Quackenbush was also given a two-point enhancement because of his abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3, and a three-point reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1, resulting in a total offense level of 28. Given his criminal history category of I, the guidelines called for a sentencing range of 78-97 months. At the sentencing hearing, the Government made a motion pursuant to U.S.S.G. § 5K1.1, which the Court granted. 11/01/02 Tr. at 6-14. The Government did not make a specific sentencing recommendation, but did request that Quackenbush not receive a sentence of less than 48 months. Id. at 7. Consistent with the Government's request, the Court imposed a sentence of 48 months. Id. at 14.

[3]     As a preliminary matter, the motion filed by Quackenbush does not comply with Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts because he did not sign it under penalty of perjury. Although Quackenbush did file an unsworn document on November 7, 2003,
(continued...)

As previously noted, Quackenbush, through counsel, filed a document on July 27, 2004, entitled "Defendant's Supplement to Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" ("D. 07/27/04 Supp."), that sought, inter alia, to assert a claim pursuant to the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004). Moreover, on February 28, 2005, Quackenbush, through counsel, filed a document, entitled "Third Supplement to Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," in which he sought to assert a claim pursuant to the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005).

It is first necessary to consider whether Quackenbush is entitled to amend his motion. There is a one-year statute of limitations applicable to the filing of a § 2255 motion. "[F]or purposes of collateral attack, a conviction becomes final at the conclusion of direct review." Johnson v. United States, 246 F.3d

---

[3]    (...continued)
entitled "Adoption of Counsel's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," in which he stated that he "personally adopts" the motion filed by counsel and "attests to the accuracy" of that motion, that unsworn document is not the functional equivalent of signing the motion under penalty of perjury. In order to expedite the resolution of this matter, the Court will consider those issues raised by Quackenbush concerning alleged errors in the presentence report, as those issues do not implicate Quackenbush's credibility. To the extent Quackenbush chooses to pursue his claim that trial counsel had a conflict of interest, he must first swear to the truth of his motion under penalty of perjury.

Quackenbush's original motion also fails to comply with that portion of Rule 2(b) which requires "shall specify all the grounds for relief which are available to the movant and of which he has or, by the exercise of reasonable diligence, shall have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified." The motion filed by counsel does not contain a coherent listing of the issues raised, and additional issues appear to be raised in footnotes or as asides. For example, the motion suggests in a footnote that counsel may not have received the presentence report and its addenda in sufficient time to review them. D. 10/31/03 Mot. at 3 n.5.

655, 657 (6th Cir. 2001). When a defendant does not take a direct appeal, then, "an unappealed district court judgment of conviction becomes 'final' ten days after the entry of judgment, at least where the defendant has not actually sought an extension of appeal time for good cause or excusable neglect." Sanchez-Castellano v. United States, 358 F.3d 424 (6th Cir. 2004); see also United States v. Cottage, 307 F.3d 494, 499 (6th Cir. 2002) ("when a § 2255 movant does not pursue a direct appeal to the court of appeals, his conviction becomes final either on the date that the judgment was entered . . . or on the date on which the time for filing such appeal expired"; describing the latter as the "majority view"); Chandler v. United States, 22 Fed. Appx. 399, 400 (6th Cir. Sept. 25, 2001). In this case, as previously noted, see supra p. 6, judgment was entered on November 6, 2002, and Quackenbush's conviction became final no later than the expiration of the time for taking a direct appeal on November 18, 2002. Quackenbush's proposed amendments, which was submitted after the limitations period had already run, would not appear to be timely. Oleson v. United States, 27 Fed. Appx. 566, 570-71 (6th Cir. Dec. 14, 2001).

Although Quackenbush would presumably argue that his Blakely and Booker amendments are timely because the running of the limitations period commenced on "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," 28 U.S.C. § 2255, ¶ 5(3), he cannot demonstrate that Blakely and Booker have

8

been made retroactively applicable to cases on collateral review. "As a general rule, new constitutional decisions are not applied retroactively to cases that were finalized prior to a new Supreme Court decision." Goode v. United States, 305 F.3d 378, 383 (6th Cir. 2002); see Schriro v. Summerlin, 124 S. Ct. 2519, 2522-26 (2004) (holding that decision in Ring v. Arizona, which held that a sentencing judge in a capital case may not find an aggravating factor necessary for imposition of the death penalty, and that the Sixth Amendment requires that those circumstances be found by a jury, does not apply retroactively to cases on collateral review); Teague v. Lane, 489 U.S. 288 (1989). Applying these standards, the Sixth Circuit has held that Blakely and Booker issues cannot be raised in an initial motion pursuant to 28 U.S.C. § 2255. Humphress v. United States, 398 F.3d 855, 860-63 (6th Cir. 2005). Accordingly, Quackenbush may not amend his § 2255 motion to assert Blakely and Booker claims.

As previously noted, on August 13, 2004, Quackenbush filed a duly executed factual affidavit asserting that trial counsel failed to take a direct appeal. To the extent this affidavit represents an attempt to amend his motion to assert a new claim of ineffective assistance of counsel, the motion is DENIED as untimely.

With respect to the issues raised in Quackenbush's initial motion, the Government first argues that errors in the application of the sentencing guidelines are not cognizable in a § 2255 motion. Response to Petitioner's Motion under Title 28, United

States Code, Section 2255, filed July 7, 2004 ("G. Br."), at 1-4. The Government's position is without merit in light of the Supreme Court's decision in Glover v. United States, 531 U.S. 198 (2001), which was not cited by either party. As a result of that decision, the Sixth Circuit has stated that "challenges that cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance under the standard set forth in Strickland v. Washington." Weinberger v. United States, 268 F.3d 346, 351 (6th Cir. 2001). Accordingly, the Court will proceed to the merits of defendant's ineffective assistance claims.

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

In order to demonstrate deficient performance by counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

10

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citation omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1999) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>Id.</u> at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Additionally, however, in analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

<u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (citing <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984)); <u>see also</u> <u>Strickland</u>, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." <u>Lockhart</u>, 506 U.S. at 369. Where, as here, a defendant contends that he received ineffective assistance of counsel in connection with his sentencing, the Supreme Court has held that any increase in a defendant's sentence constitutes

12

prejudice within the meaning of Strickland. Glover v. United States, 531 U.S. at 202-04.[4]

The most substantial issue raised in the defendant's motion is the assertion that trial counsel rendered ineffective assistance by failing to object to the calculation of the amount of the laundered funds in the amount of $18.5 million. D. 10/31/03 Mot. at 3-4. As previously mentioned, see supra p. 5 n.2, the money laundering guideline, U.S.S.G. § 2S1.1, was used to calculate the base offense level. Quackenbush received a nine-level enhancement, pursuant to U.S.S.G. § 2S1.1(b)(2)(J), because "the value of the funds" exceeded $10 million. As the first ground for his § 2255 motion, Quackenbush argues that the nine-level enhancement was improperly applied because "the value of the funds" refers to the amount of funds that were "laundered"—in this case, the $121,114.37 in bribes that were paid to Quackenbush, see Presentence Report, ¶ 17—rather than the value of the performance bonds that were issued, see id., ¶¶ 13-14, the funds received from investors and financial institutions, or the losses to the victims of the fraudulent scheme, id., ¶¶ 18, 20.

---

[4]     The only issue before the Supreme Court in Glover, 531 U.S. at 199-200, was whether an increase in a defendant's sentence due to a misapplication of the sentencing guidelines constituted prejudice within the meaning of Strickland. Thus, the Supreme Court did not address the standard for assessing whether an attorney's failure to recognize an error in the application of the sentencing guidelines constituted deficient performance. Id. at 205. For purposes of this order, the Court assumes that any failure to object to an error in the presentence report constitutes satisfies the first prong of Strickland. In light of the complexity of the guidelines at issue here, and the fact that any error by the experienced probation officer who prepared the report overlooked by the Government and this judge, it is far from clear that that assumption is correct.

Although Quackenbush's motion is premised on the fact that the only relevant conduct that falls within the purview of the money-laundering statute was the receipt of bribes by him, he cites no authority for that proposition. Moreover, analysis of the application of the § 2S1.1(b)(2) enhancement is complicated by the fact that the guidelines do not define "the value of the funds," and neither party has cited any decision interpreting this language. The law is clear that the amount of loss to the victims has no bearing on the defendant's offense level under the money-laundering guideline. See, e.g., Ghosheh v. United States, Nos. 96-6203, 96-6204, 1998 WL 180560, at *2 (6th Cir. Apr. 9, 1998) (per curiam); United States v. Thompson, 40 F.3d 48, 51-52 (3d Cir. 1994). Thus, the nine-level enhancement was warranted only if "the value of the funds" refers to the funds received from investors or financial institutions or the face amount of the performance bonds that were issued.

In response to the defendant's motion, the Government states as follows:

> The defendant argues that the amount of funds laundered in the Presentence Report is incorrect. The Presentence Report used $18,500,000.00 as the amount of funds to be laundered. The defendant seeks to argue that the amount is actually $121,000.00. This statement is completely erroneous and ignores considerable information presented to the court. First, the defendant ignores count one of the indictment [sic] charging the defendant conspired to commit $18,500,000.00 in fraud against the investing public. Additionally, it also charges he conspired to launder funds in furtherance of the scheme. Obviously, as part of the conspiracy, the defendant does not actually have to conduct the financial transactions, but simply agrees to assist in the crime. Paragraphs one through ten of the Presentence Report clearly lay out the

14

scheme whereby Namer and Baresel[5] were selling millions of dollars of fraudulent notes in a scheme to defraud the investing public. Paragraph eleven states: "In order to execute the scheme, Namer enlisted the services of Richard Quackenbush, Vice-President of underwriting for Universal Bonding." Thus, the defendant agreed to assist in defrauding the investing public of the $18,500,000.00 in notes sold with fraudulent insurance issued by Mr. Quackenbush. Thus, he also agreed that every financial transaction necessary in these securities, i.e., sales to investors, transfers between brokerage accounts, transfers to trustees, transfers to bank accounts of Network Mortgage Services,[6] all were part of the conspiracy.

In short, the $18,500,000.00 in money laundering could not have occurred but for Richard Quackenbush's issuance of the insurance. The record is clear that Quackenbush reviewed numerous private placement memorandums prior to the issuance and knew these financial transactions were going to be conducted. . . . By issuing the insurance, he agreed to assist in causing these transactions to occur.

The defendant seeks to argue that the only amount laundered was the amount paid to him. In the defendant's petition, he simply makes a conclusory statement and fails to demonstrate to the court how the other financial transactions directly caused by Mr. Quackenbush are not money laundering violations. Obviously, conclusory statements are insufficient upon which to reverse the District Court's sentencing order.

G. Br. at 4-5. Unfortunately, the Government cites no authority for

the proposition "every financial transaction necessary in these

securities, i.e., sales to investors, transfers between brokerage

accounts, transfers to trustees, transfers to bank accounts of

Network Mortgage Services" constitutes money laundering. Moreover,

the Government does not attempt to correlate those various sales

---

[5]    Baresel is not mentioned in the information filed against Quackenbush.

[6]    Network Mortgage Services is not mentioned in the information filed against Quackenbush.

and transfers to the calculation of the value of the funds in the
presentence report.

In his reply, which was filed on July 27, 2004,
Quackenbush asserts that the Government's response failed to
distinguish "between allegations of fraud, and allegations of money
laundering." D. 07/27/04 Supp. at 7 (emphasis omitted). However,
although Quackenbush asserts that mail and wire fraud "are entirely
separate crimes" from money laundering, id., he fails to cite
authority for the proposition that the receipt of money from a
fraudulent scheme is not money laundering, see id. at 8 n.16.

In order to resolve this aspect of the defendant's
motion, it is first necessary to consider whether the various sales
and transfers identified in the Government's response constitute
money laundering. The elements of the money laundering offenses
with which Quackenbush was charged[7] are:

---

[7]     The statute provides as follows:

Whoever, knowing that the property involved in a financial
transaction represents the proceeds of some form of unlawful
activity, conducts or attempts to conduct such a financial
transaction which in fact involves the proceeds of specified unlawful
activity—

(A)(i)     with the intent to promote the carrying on of
specified unlawful activity; or

. . . .

(B)     knowing that the transaction is designed in whole or in
part—

(i)     to conceal or disguise the nature, the location,
the source, the ownership, or the control of the proceeds of
specified unlawful activity; . . .

shall be sentenced to a fine of not more than $500,000 or twice the
value of the property involved in the transaction, whichever is
(continued...)

"(1) use of funds that are proceeds of unlawful activity;
(2) knowledge that the funds are proceeds of unlawful
activity; and (3) conduct[ing] or attempt[ing] to conduct
a financial transaction, knowing that the transaction is
designed in whole or in part to disguise the nature,
source, ownership, or control of the proceeds."

United States v. Prince, 214 F.3d 740, 747 (6th Cir. 2000) (quoting

United States v. Moss, 9 F.3d 543, 551 (6th Cir. 1993)).[8]

With respect to the Government's assertion that the
receipt of funds from financial institutions and investors itself
constitutes money laundering, the first element, use of funds that
are proceeds of an unlawful activity, is apparently satisfied in
this case because "the money, once wired by the victims,
constituted proceeds of wire fraud." Id. at 748; see also id. at
747-50. Quackenbush's guilty plea is also sufficient to satisfy the
second element, knowledge that the funds are proceeds of unlawful
activity.

The third element of money laundering, conducting or
attempting to conduct a financial transaction knowing that the
transaction is designed in whole or in part to disguise the nature,
location, source, ownership, or control of the proceeds, is more
difficult to analyze in the context of this case. At least some of
the various transfers and sales described by the Government would

---

[7]      (...continued)
greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i) & (B)(i).

[8]      The conduct charged in the second count of the information,
concerning Quackenbush's receipt of a specific bribe, plainly constitutes money
laundering. Likewise, to the extent the first count of the information charges
Quackenbush with receiving bribes, that plainly satisfies the elements of money
laundering under the facts of this case.

appear to constitute financial transactions within the meaning of 18 U.S.C. § 1956(c)(4).[9] For example, it can persuasively be argued that the transfer of the proceeds of the bond offerings from the trustee to the corporations controlled by Namer constituted a financial transaction within the meaning of the money laundering statute. See Prince, 214 F.3d at 750-51; see also id. at 751 n.7 (citing United States v. Cavalier, 17 F.3d 90 (5th Cir. 1994)).[10]

In order to satisfy the third element of money laundering, it is also necessary to demonstrate that Quackenbush knew that "the transaction is designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds." In Prince, 214 F.3d at 750, a case with some factual similarities to the instant case, the defendant argued that the third element was not satisfied because there was no proof of a subsequent financial transaction designed to conceal the nature of the funds. The Sixth Circuit rejected that argument on the ground

---

[9]     That provision defines "financial transaction" as

(A) a transaction which in any way or degree affects interstate or foreign commence (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

See also 18 U.S.C. §§ 1956(c)(3) (defining "transaction"), 1956(c)(5) (defining "monetary instruments").

[10]     Significantly, however, the analysis in Prince seems to preclude the possibility that the initial transfers of funds from the victims, either by wire or mail, itself constituted "financial transaction[s]" sufficient to satisfy the third element. See id. at 750 ("The subsequent transactions involving the proceeds of wire fraud constitute financial transactions as defined in section 1956.") (emphasis added).

that "[t]he evidence presented suggests that Prince, at the very least, aided and abetted in a scheme in which there was an attempt to conceal the true owner and controller of funds." Id. at 751-52.[11] Likewise, in this case, the first count of the information charges Quackenbush, pursuant to 18 U.S.C. § 2, of aiding and abetting Namer's scheme in which there was an attempt to conceal that he controlled the proceeds of the bond offerings. It is arguable, therefore, that the money laundering allegations in the first count of the information encompass more than just the bribes paid to Quackenbush.

In response, Quackenbush argues, in essence, that the information does not clearly allege any acts of money laundering other than the bribes paid to him and, therefore, it is unreasonable to conclude that his guilty plea encompassed any admission that the various sales and transfers relied on by the Government constituted money laundering or that he aided and abetted those sales and transactions. D. 07/27/04 Supp. at 6-9. Although this argument has some persuasive value, the defendant has failed to cite the legal standards for factual specificity in a criminal information. The defendant also has not cited any authority for the proposition that a guilty plea must encompass not only an admission that there is a sufficient factual basis to convict on the offenses stated in the information, but also an

_____

[11] In so holding, the Sixth Circuit cited United States v. Elder, 90 F.3d 1110, 1125-26 (6th Cir. 1996), a case in which a defendant's conviction for money laundering was affirmed on the basis of evidence that she wired money in her own name to conceal the fact that the money constituted drug proceeds that belonged to a codefendant.

19

admission that each and every legal characterization advanced by the Government is accurate. Moreover, to the extent Quackenbush purports to rely on <u>Blakely v. Washington</u>, <u>see</u> D. 07/27/04 Supp. at 8-9, that argument is foreclosed by the Sixth Circuit's decision in <u>Humphress</u>. <u>See</u> <u>supra</u> pp. 8-9.

The briefs submitted by Quackenbush and the Government are insufficient to permit the Court to determine the nine-point enhancement based on "the value of the funds," U.S.S.G. § 2S1.1(b)(2)(J), was appropriate. If that enhancement was not appropriate, it appears likely that the guideline range contained in the presented report was too high.[12] If that is the case, and if it is also demonstrated that trial counsel's failure to call attention to that error constituted deficient performance within the meaning of <u>Strickland</u>, <u>see</u> <u>supra</u> p. 13 n.4, then Quackenbush would be entitled to have his sentence vacated and to be resentenced under the correct guidelines. Accordingly, the Government is ORDERED, within thirty (30) days of the date of entry of this order, to file a supplemental brief describing, in detail and with citations to any applicable legal authority, its position concerning (i) the scope of the money laundering allegations in the

---

[12]    The other challenges to the guideline calculation in the presentence report rest on the assumption that only the bribes paid to Quackenbush constituted money laundering. One such example is Quackenbush's argument that he should have been sentenced under the fraud guidelines, rather than the guidelines for money laundering. D. 10/31/03 Mot. at 4-5. Moreover, even if the Court were to accept the defendant's view that the money laundering encompasses only the bribes paid to him, Quackenbush cites no authority rejecting application of the money-laundering guideline in circumstances similar to this one. Likewise, the Court is unable to conclude that the presentence report used the wrong edition of the sentencing guidelines manual in the absence of any evidence that use of a later edition prejudiced Quackenbush in violation of the <u>ex post facto</u> clause. <u>United States v. Kussmaul</u>, 987 F.2d 345, 350-52 (6th Cir. 1993).

first count of the information; (ii) the manner of calculation of the nine-point enhancement, pursuant to U.S.S.G. § 2S1.1(b)(2)(J); and (iii) whether Quackenbush's guilty plea was intelligent and voluntary in light of his present position that he had no idea he was pleading guilty to any money laundering offense other than the receipt of approximately $121,000 in bribes. Quackenbush is ORDERED, within thirty (30) days after the date the Government's brief is filed, to submit a supplemental brief demonstrating, in detail and with citations to any applicable legal authority, why the sentencing guideline calculations contained in the presentence report are legally erroneous. Both parties are also welcome to submit any legal argument concerning the standards for determining deficient performance by an attorney in connection with the misapplication of the sentencing guidelines.

Finally, Quackenbush has filed motions, on September 10, 2004; October 19, 2004; and December 10, 2004, motions seeking a prompt disposition of his § 2255 motion. In light of the issuance of this order, each of these motions is DENIED as moot. The length of time it has taken to resolve this motion is attributable to the press of other business properly before the Court, as well as the extreme complexity of the issues presented by this motion. To the extent the defendant is concerned about the time it takes to resolve his motion, his remedy is to file a motion for release on bail, pursuant to Fed. R. App. P. 23(b). To the extent Quackenbush is seeking an immediate evidentiary hearing, his motions are DENIED. For the reasons set forth in this order, Quackenbush has

not made the threshold showing that the sentence calculations in the presentence report were erroneous. Once that issue has been resolved, the Court will consider whether an evidentiary hearing is necessary on the issue of deficient performance.

IT IS SO ORDERED this _25th_ day of April, 2005.

BERNICE B. DONALD
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 21 in case 2:03-CV-02814 was distributed by fax, mail, or direct printing on April 26, 2005 to the parties listed.

---

Curtis S. Fallgatter
FALLGATTER & FARMAND, P.A.
200 East Forsyth St.
Jacksonville, FL 32202

Stephen C. Parker
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable Bernice Donald
US DISTRICT COURT